RAE #2

RECEIVED BY MAIL
MAY 21 2020
CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

SCANNED
MAY 21 2020
U.S. DISTRICT COURT - MPLS


**TWIN CITIES ORTHOPEDICS**

March 21, 2020

Tony T. Robinson
Federal Reg #18099041
Federal Correctional Institution
P O Box 5000
Greenville IL  62246

RE:   Robinson v Dannewitz MD, et al.
      Ref #17-CV-437-DSD-KMM

Dear Mr. Robinson:

I received your letter with various interrogatives with regard to your current legal case addressing your right foot injury sustained on 4/14/2014. I have also completed a written report and an update to the affidavit dated 8/15/2017 which will be sent in a separate letter.

All of the responses to the interrogatives below are provided to within a reasonable degree of medical certainty based on my expertise as a board-certified orthopedic surgeon with subspecialty fellowship training in foot and orthopedic surgery. All of the information provided below is true and offered as a result of my familiarity of your case as my patient through the course of multiple clinic and postoperative visits from 6/13/2014 through 8/13/2014 as well as a review of the medical records provided to my office from the correctional institution where the injury occurred.

1. Please state what is the standard of care recognized by the medical community as applicable to the following:

    a. Stephen Dannewitz, MD, an emergency medicine physician.
    b. Ranjiv Saini, MD, a board certified radiologist.
    c. Jeanne Luck, LPN, a licensed practice nurse.

    I personally cannot provide specific information with regard to the standard of care that is expected for medical practitioners out of my own area of expertise. The standard of care for an orthopedic surgeon in management of a foot and ankle injury involves obtaining an accurate history and physical examination, appropriately correlating physical examination findings with suspected injuries, ordering appropriate radiographic studies and providing accurate interpretation of the radiographic studies, and developing a reasonable diagnosis and treatment plan based on information accumulated from the above. While emergency medicine physicians and licensed practice nurses may certainly be familiar with the diagnosis and treatment of common orthopedic injuries, I would not expect either of these providers to necessarily identify, diagnose, or treat more unusual orthopedic injuries though should certainly be able to provide an appropriate pathway for treatment including further imaging studies, orthopedic consultation, etc. for unusual or occult orthopedic injuries or conditions. I am not a board-certified radiologist and cannot speak to what the standard of care is for a radiologist in identifying a navicular fracture on ankle or foot x-rays.

2. Please state which party, in your opinion, from Question 1 departed from the applicable standard of care and how.

   As noted above, I can speak to the standard of care for evaluation and treatment of a foot sprain from the standpoint of an orthopedic surgeon. I cannot, however, comment on what the specific standard of care each of the above individuals would be held to in evaluation and management of a foot sprain or a navicular fracture.

3. Please state if the departure from Question 2 was the approximate or direct cause of Robinson's injury.

   While I cannot speak to the standard of care to which an emergency medicine physician, radiologist, or licensed practice nurse would be held in this scenario, I can state given my expertise as a board-certified orthopedic surgeon with subspecialty fellowship training in foot and ankle orthopedic surgery, that the standard of care for treatment of Mr. Robinson's navicular fracture was not met as a result of the fracture not being recognized through multiple radiographic imaging series. I do believe that the navicular fracture sustained by Mr. Robinson on 4/14/2014 is more likely than not to have healed and not required surgical intervention had the fracture been identified initially and the foot protected with immobilization and limited weightbearing for a period of approximately six to eight weeks. As a result of the fracture not being recognized, the fracture did not heal and ultimately required operative intervention to address persistent pain and symptoms.

4. Please state whether you have the practical knowledge of what is usually and customarily done by care providers under circumstances similar to those listed in Question 1.

   While I cannot speak to the specific standard of care to which each of these care providers is held, I would suggest that a licensed practice nurse and an emergency medicine physician should be able to recognize common orthopedic injuries and relatively obvious fractures on radiographs. The navicular fracture sustained by Mr. Robinson is more of an unusual injury and in an area of the foot where fractures can be commonly missed on radiographic review. While I do not necessarily expect Dr. Dannewitz or Ms. Luck to have identified the fracture on the radiographic studies ordered, I would expect a treatment plan would be provided for persistent pain or difficulty bearing weight on the foot in the setting of presumably negative radiographic studies. I do not have any documentation indicating at which point a referral was placed by Mr. Robinson to be evaluated at an orthopedic clinic, but this certainly would be the appropriate next step in care provided by Dr. Dannewitz given the report of the negative x-ray and persistent pain in the foot limiting Mr. Robinson's activity and ability to bear weight comfortably. It is unclear which provider evaluated Mr. Robinson after his initial injury on 4/14/2014. It is not clear from the clinical documentation the extent of the physical examination that was performed and if pain was truly localized solely around the ankle, prompting the ankle x-rays or if pain was noted around the hindfoot or midfoot, which would generally prompt ordering foot radiographs as well.

5. Please state the importance of ordering both x-rays of the ankle and foot initially when presented with the facts of this case (patient fell [invertedly], felt a snap and ankle pain).

It is standard practice in my clinic and for an orthopedic surgeon to order appropriate radiographic studies when concerned about a potential bone or joint injury. In my clinic, a patient presenting with an ankle sprain with pain localized around the ankle joint on examination will undergo ankle x-rays. If there is any tenderness localized on examination or endorsed by the patient throughout the foot, then foot x-rays will also be obtained. Which x-rays are ordered is generally based on the patient's described location of symptoms as well as the location of pain noted on examination.

6. Please state how many x-rays on average do you interpret on a yearly basis. Have you always interpreted your own x-rays?

It would be difficult to provide an accurate number of radiographs I interpret on an annual basis. I generally see between 15 to 20 patients during a single half-day of clinic and am in clinic for five half-days per week. In general, radiographs would be ordered for 75% of those patients. In my clinic, I am solely responsible for the interpretation of radiographs obtained in the clinic as we do not send out our radiographs for evaluation by a radiologist. This is relatively common practice within orthopedic clinics across the country. I do obtain radiology interpretations for any advanced imaging studies such as CT scans or MRI scans, but also perform my own independent evaluations of these studies as well.

7. Please state what does ecchymosis tell you over the patient's injury site?

Ecchymosis or bruising is frequently noted immediately around the zone of injury following either indirect or direct injuries. Initially, ecchymosis focuses around the zone of injury although within a few hours to a few days, discoloration can spread, typically into the heel or even around the bases of the toes as gravity pulls the blood products responsible for the discoloration of the skin away from the zone of injury.

8. Please state whether the delay in obtaining the foot x-rays had a detrimental effect to Robinson.

Unfortunately, the navicular fracture sustained on 4/14/2014 was not recognized on the initial ankle radiographs, and Mr. Robinson was allowed to progress weightbearing activity in a boot with crutches for support. Had the fracture been identified on the initial ankle radiographs, or foot radiographs been ordered initially, and the fracture ideally recognized on this series, Mr. Robinson should have been fully restricting weightbearing activity on the foot in a boot or a supportive splint. More urgent orthopedic evaluation should have been pursued in the setting of a navicular fracture. As noted, it is more likely than not that had a nondisplaced fracture of this area been recognized and treated with appropriate nonweightbearing precautions for six to eight weeks, that operative intervention would not have been necessary.

9. Please state the treatment that you recommend for a foot sprain.

A foot sprain is a very broad diagnosis and implies a ligament injury to any part of the foot. Barring any concern for acute fracture or significant joint instability based on history, physical examination, or radiographic studies, a stable foot sprain may generally be treated with conservative treatment to include progressive weightbearing activity with a supportive boot or orthotic, ice, over-the-counter medication, and activity modification as pain demands.

10. Please state if interpreting x-rays are in your normal course of daily business.

    As noted above, interpretation of radiographs is an essential component to my daily clinical practice. I would estimate I obtain radiographs on approximately 75% of the patients that I see in clinic on a daily basis.

11. Please state whether the standard of care is attached to a particular profession or type of injury and why.

    Each medical specialty and provider degree have their own standard of care which is based upon their level of training and area of expertise. Just as I would not expect an orthopedic surgeon to understand the management of congenital heart disease to a degree of treating patients with this condition, I would not expect a primary care provider to understand the specific management for a navicular fracture. It is reasonable to expect a provider to understand when they are dealing with a condition that they are not trained or skilled to manage to obtain appropriate studies and referrals to ultimately provide appropriate patient care.

12. Are you in the opinion that the delay was detrimental ("the patient was seen approximately two weeks after his initial injury for followup")?

    Ultimately, the delayed diagnosis of Mr. Robinson's navicular fracture was detrimental to the healing of the fracture and ultimately led to need for surgical intervention. Ultimately, Mr. Robinson's fracture may still have healed and responded well to conservative treatment if it was recognized on the foot radiographs obtained following the 4/30/2014 visit.

13. Please state what your understanding of what delivered indifference means to you in regard to medical treatment.

    I understand delivered indifference entails the conscious or reckless disregard of the consequences of one's acts or omissions. I presume this would imply more than negligence on the part of a medical provider but a conscious decision to be negligent or ignore the potential consequences of mistreatment.

14. Please state if you are of the opinion that discontinuing the splint and crutches on 4/30/2014 by Dr. Dannewitz after he diagnosed Robinson with a foot sprain and knowing Robinson could not bear weight was a deviation of the standard of care, and were his actions an approximate cause of Robinson's injury regardless of a negative x-ray.

    If a patient presents with a stable foot sprain and there is no concern for significant osseous injury that would require limited weightbearing precautions, I would generally encourage progressive weightbearing as pain dictated, understanding that a crutch, boot, or other assistive aid may still be required to allow for more comfortable activity until the sprain and associated soft tissue damage improved. While this may not represent the best care, I do not believe that discontinuing the splint and crutches in this situation deviated from the standard of care if Dr. Dannewitz believed Mr. Robinson had sustained a stable foot sprain and not a more significant injury. Presumably, Dr. Dannewitz was acting based on the information provided by the

radiologist with regard to the foot x-rays obtained on 4/30/2014 which by report did not reveal any acute osseous injuries.

15. Please state if a doctor such as Dannewitz MD notes on a patient's medical records "he has ecchymosis on his instep, which makes me think we may have missed a fracture or he has a sprain that is resolving", please state in your opinion as to who is "me" and who is "we" in this statement.

I cannot speak exactly to whom Dr. Dannewitz was referring with the use of the specific pronouns in his note. I would assume that he personally thought that he and/or the other medical providers who were participating in Mr. Robinson's care had missed a fracture.

16. Please state whether you are of the opinion that Dr. Dannewitz had actual knowledge of a serious medical need as stating "which makes me think we may have missed a fracture or he has a sprain that is resolving" but failed to take reasonable measures to address it.

As noted above, Dr. Dannewitz does recognize Mr. Robinson's discomfort and significant examination findings in his clinic note on 5/07/2014. I do not have any further documentation indicating at which point a referral was placed for Mr. Robinson to be evaluated at an orthopedic clinic, though this certainly would be an appropriate next step in care given the report of the negative x-ray and persistent pain in the foot limiting the patient's activity and ability to bear weight comfortably.

17. Please state if you believe Jeanne Luck, LPN, should have ordered an x-ray of the foot on the initial evaluation.

Unfortunately, it is difficult to tell from the medical documentation who the provider was who evaluated Mr. Robinson immediately following his injury on 4/14/2014. Nonetheless, the documented physical examination is very brief, and there is no report with regard to where pain was localized on examination. If pain was present around the hindfoot or midfoot, foot x-rays would be appropriate to order in this setting. If pain was localized to and limited to the ankle, then ankle x-rays alone would be the appropriate imaging evaluation.

18. Please state what are the determining factors you consider when you order x-rays of certain sites.

In the setting of acute injury, ordering x-rays is generally determined based on the location of pain and the joints involved. In a high energy or significant trauma setting, it is routine to obtain radiographs of the joints above and below the zone of injury. Around the foot and ankle, most of the adjacent joints can be identified on a single radiographic series. When evaluating a foot or ankle sprain, I will obtain x-rays based upon where the patient describes pain and/or where pain is localized on examination.

19. Please state other than your practical experience as an actual surgeon, do you possess the same practical experience as Jeanne Luck, LPN, who ordered the 4/16/2014 x-ray of the ankle, issued crutches, CAM boot, authorized low bunk, lower tier restriction and issued two pillows for two weeks?

Given my experience as an orthopedic surgeon, I have extensive practical experience in evaluation and management of foot and ankle sprains to include ordering radiographs and conservative treatments as presumably provided by Jeanne Luck, LPN.

20. Please state whether the irregularity along the lateral and plantar portion of the navicular on the mortise view of the 4/16/2014 x-ray was something that every board-certified radiologist should have found and noted and prompted additional x-rays.

    While the navicular fracture is clearly noted on the ankle radiographs obtained on 4/16/2014, I cannot speak to whether recognition of this fracture on ankle radiographs would fall within the standard of care for a board-certified radiologist. Hindsight when evaluating radiographic studies is always beneficial, particularly when knowing the particular zone of injury on which to focus. The clinical information provided on the radiographic order based on the radiology report was simply "injury", so I would expect the radiologist to evaluate the entire imaging study for evidence of an acute injury. Radiologists do not have the benefit of a patient's history and physical examination to focus in on a specific zone of injury and do rely on the information provided by the ordering providers to assist in interpretation of radiographic studies. It is not unusual for a radiologist to ask the ordering provider to correlate radiographic findings with the clinical examination. It is also not unusual for a radiologist to suggest additional studies if unusual or unexpected findings are uncovered on radiographic studies.

21. Please state whether the two weeks suggested by Jeanne Luck, LPN was sufficient for healing.

    For a nondisplaced navicular fracture, two weeks of limited weightbearing precautions or protected weightbearing precautions would be inadequate to allow adequate healing of the fracture. If nonoperative treatment of a nondisplaced navicular fracture is recommended, I would expect at least six to eight weeks of nonweightbearing precautions would be required to allow for adequate healing across the fracture site before progressing weightbearing activity.

Please also find attached to this document the requested documents including medical records that have been provided from the Correctional Institution as well as the records generated from your care through Twin Cities Orthopedics.

Please feel free to contact my clinic if you have any further questions or concerns with regard to my responses to the above interrogatives.

Sincerely,

Jeffrey D. Seybold MD
Twin Cities Orthopedics

LESLIE M. BERGSTROM
Notary Public-Minnesota
My Commission Expires Jan 31, 2025