# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

Tony Terrell Robinson,

        Plaintiff,

v.

Minnesota, State of et al.

        Defendants.
_____

Case No. 17cv437-DSD-KMM

**REPORT AND RECOMMENDATION**

    This matter comes before the Court on Motions for Summary Judgment from the three remaining defendants: Dr. Ranjiv Saini (ECF No. 219), Dr. Stephen Dannewitz (ECF No. 242), and Jeanne Luck and Centurion of Minnesota, LLC (collectively, "the Centurion defendants") (ECF No. 252). After careful consideration of all of the filings in this matter, the Court recommends that all three motions be GRANTED, and this case be DISMISSED.

## I.     FACTUAL BACKGROUND

    Mr. Robinson alleges that on April 6, 2014, he injured his right ankle while playing basketball at the Minnesota Correctional Facility in Lino Lakes, Minnesota. (2d Amend. Compl., ECF No. 197 at ¶ 11.) He was taken to health services via wheelchair, where he was seen by an unknown nurse, who gave him crutches. (*Id.* at 11–12.) No doctor was onsite at that time to perform an x-ray, but Mr. Robinson was placed on the list for imaging the next day. (*Id.* at ¶ 12.)

    On April 7, Mr. Robinson alleges that he was seen by Nurse Jeanne Luck, who did not believe that his ankle was broken, but ordered an x-ray, nonetheless. (*Id.* at ¶ 13.) She also ordered a lower-tier room restriction and provided Mr. Robinson with a Cam Walker boot. (*Id.*) Mr. Robinson alleges that he continued to experience pain, and was seen by other health care providers between April 8, 2014 and April 15, 2014.

On April 16, 2014, Mr. Robinson's right ankle was x-rayed by former defendant Jamie Lindahl. (*Id.*) Dr. Saini interpreted the x-ray that same day, and found no evidence of acute fracture or dislocation. (*Id.*; *see also* Affidavit of Dr. Ranjiv Saini, ECF No. 221 at ¶¶ 10–12.)

Mr. Robinson continued to experience pain, and on April 29, 2014, saw emergency-medicine physician Dr. Dannewitz. (2d Amend. Compl. at ¶ 15.) Dr. Dannewitz noted that Mr. Robinson's pain seemed to be located more in the foot than the ankle, and ordered an x-ray on the foot. The next day, the foot was x-rayed. (Declaration of Katherine McBride, ECF No. 245, at 4.) Dr. Ann Glaser, a former defendant in this case, reviewed the x-ray remotely. She noted no evidence of acute fracture or dislocation. (McBride Decl., Ex. 1 at 10.) Dr. Dannewitz, relying on Dr. Glaser's report, told Mr. Robinson that he had sprained his foot and could stop using the crutch and Cam Walker. (*Id.* at 4.)

Unfortunately, Mr. Robinson continued to experience pain, and signed up for sick call multiple times over the next week. (2d. Amend. Compl. at ¶ 17.) On May 7, 2014, he saw Dr. Dannewitz again, and told him about his continuing pain. (*Id.*) Dr. Danneweitz noticed ecchymosis—a discoloration of the skin caused by bleeding—on Mr. Robinson's instep, and ordered a second x-ray, suspecting either a missed fracture or a sprain that was resolving. (*Id.*) He also told Mr. Robinson to use both crutches (he had previously only been using one) and to avoid putting weight on the foot until they received the x-ray report. (*Id.*) That same day, another x-ray was taken. Dr. Glaser reviewed the images and once again found no evidence of fracture or dislocation. (McBride Decl., Ex. 1 at 11.)

Shortly after the May 7th x-ray, Mr. Robinson was released from MCF Lino Lakes. (2d Amend. Compl. at ¶ 20.) On June 13, 2014, he saw Dr. Jeffrey Seybold, an orthopedic surgeon at Twin Cities Orthopedics. Dr. Seybold x-rayed Mr. Robinson's foot and determined that he had a "nondisplaced fracture noted at the lateral navicular without marked displacement at the talonavicular joint." (2d Amend. Compl. at ¶ 22.) Dr. Seybold ordered a CT scan to assess how the fracture was healing and provided Mr. Robinson with a Cam walker boot. (*Id.*) On June 17, 2014, the CT scan was performed, which found an "acute to subacute fracture involving the plantar lineal aspect of the talonavicular joint." (*Id.* at ¶ 23.) Mr. Robinson saw Dr.

2

Seybold for a follow-up appointment on June 26, 2014, where Dr. Seybold informed him that there was no evidence that the fracture was healing. (*Id.* at ¶ 25.) Dr. Seybold believed that the fracture would not heal on its own, and recommended surgery to remove the fractured bone. (*Id.*) Mr. Robinson had surgery to remove the navicular fragment on July 11, 2014. (2d. Amend. Compl. Ex. 13.) Two weeks later, in a post-surgery follow up, Dr. Seybold noted that Mr. Robinson was recovering well and could begin transitioning to bearing weight on his foot. (*Id.* at Ex. 16.)

On August 14, 2014, Mr. Robinson was federally indicted and incarcerated at Sherburne County Jail. (*Id.* at ¶ 29.) A week later, he was transferred to the custody of the Minnesota Department of Corrections and housed at Ramsey County Jail. (*Id.* at ¶ 30.) While there, Mr. Robinson reported ongoing pain in his foot. (*Id.*) Per Dr. Seybold's post-surgery recommendations, he was provided with a supportive shoe. (*Id.*) At an unknown date, he was then transferred back to Sherburne County. (*Id.* at ¶ 31.)

On May 19, 2015, while in custody, Mr. Robinson saw another doctor, Dr. Edwards, at the Twin Cities Orthopedics office in Rogers, Minnesota. Dr. Edwards noted that the site of injury was healing well, but opined that Mr. Robinson may experience pain and discomfort for the rest of his life. (*Id.* at ¶ 32.) Mr. Robinson was next transferred to the Bureau of Prisons Holding Facility in Oklahoma, where he alleges that he reported his ankle pain and Dr. Seybold's recommendations, but that his requests for orders consistent with those recommendations were denied. (*Id.* at ¶ 33.) In October, 2015, Mr. Robinson was transferred to a federal prison in Pekin, Illinois. (*Id.* at ¶ 34.) He alleges that he continues to experience pain, but that multiple requests for a supportive shoe have been denied. (*Id.*)

## II.   ANALYSIS

Mr. Robinson alleges deliberate indifference to serious medical needs in violation of the Eighth Amendment. He claims that the defendants deliberately delayed treatment and prevented him from accessing appropriate medial care. Additionally, Mr. Robinson asserts that all defendants acted negligently in their treatment of him. Specifically, he alleges that Dr. Dannewitz, Dr. Saini, and Nurse Jeanne Luck committed medical malpractice when they incorrectly diagnosed him

3

with a foot sprain and provided follow-up care for that injury, rather than properly diagnosing and treating his fracture.

The defendants in this case have all filed dispositive motions for summary judgment. (ECF Nos. 219, 242, 252.) In response, Mr. Robinson filed several motions asserting that summary judgment is premature. (ECF Nos. 268, 273.) Because a motion for summary judgment may be filed at any time until 30 days after the close of discovery, Fed. R. Civ. P. 56 (b), the Court instructed Mr. Robinson to respond to the substance of the pending motions. (Order, ECF No. 318.) Mr. Robinson did so, the defendants replied, and Mr. Robinson was granted a surreply. However, the deadline to file the surreply has now passed without an additional filing from Mr. Robinson.

The briefing regarding the summary judgment motions is now complete. After careful consideration, the Court recommends that the motions for summary judgment be granted, and Mr. Robinson's motions to deny summary judgment be denied. In addition, there are several outstanding discovery motions, which the Court recommends be denied as moot.

### A.     Legal Standard

A movant is entitled to summary judgment where "no genuine dispute as to any material fact [exists] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where no reasonable jury could find in favor of the non-movant, there is no genuine dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are only those "that might affect the outcome of the suit under the governing law." *Id.* Where there is a genuine dispute of facts, the record should be viewed in the light most favorable to the non-moving party. *E.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Id.*

The moving party must first "identify the portions of the record that it believes demonstrate the absence of a genuine dispute of material fact." *Bedford v. Doe*, 880

4

F.3d 993, 996 (8th Cir. 2018) (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). It can satisfy its burden either by demonstrating evidence that negates an essential element of the non-movant's case or by showing that insufficient evidence exists to support the non-moving party's case. *Id.* Once the moving party has satisfied its initial burden, the responsibility shifts to the non-moving party to submit evidence of "specific facts showing the presence of a genuine issue for trial." *Id.* (citing *Torgerson*, 643 F.3d at 1042). In doing so, "[a non-moving party] may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor without resort to speculation, conjecture, or fantasy." *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790–91 (8th Cir. 2009) (quotations and citations omitted); *see also Frevert v. Ford Motor Co.*, 614 F.3d 466, 473 (8th Cir. 2010) ("'[a] properly supported motion for summary judgment is not defeated by self-serving affidavits." (quoting *Bacon v. Hennepin Cty. Medical Center*, 550 F.3d 711, 716 (8th Cir. 2008))).

### B. Deliberate Indifference

To demonstrate a violation of the Eighth Amendment by deliberate indifference to serious medical needs, a plaintiff must demonstrate both that he suffered from an objectively serious medical need and that prison officials actually knew of that need, but deliberately disregarded it. *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019). A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991). Medical malpractice on its own does not establish a constitutional violation. *McRaven v. Sanders*, 577 F.3d 974, 982–83 (8th Cir. 2009); *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008); *Robinson v. Moreland*, 655 F.2d 887, 890 (8th Cir. 1981). And a plaintiff's disagreement with a course of treatment also does not demonstrate deliberate indifference. *See Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007). Rather, deliberate indifference "entails a level of culpability equal to the criminal law definition of recklessness; that is, a prison official 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004) (quoting *Farmer v.*

*Brennan*, 511 U.S. 825, 837 (1994)).

### 1. Claim Against Dr. Saini

Dr. Saini argued that the claim against him must fail for several reasons. First, he argues that he is not subject to a § 1983 claim because he is not a state actor. Second, he argued that even if he could be held liable under § 1983, the claim would fail because Mr. Robinson cannot prove any constitutional deprivation caused by Dr. Saini. In response to these arguments, Mr. Robinson conceded that the § 1983 claim against Dr. Saini is fatally flawed. (ECF No. 343 at 43.) Therefore, the Court recommends summary judgment be granted to Dr. Saini on the § 1983 claim.

### 2. Claim Against Dr. Dannewitz

Mr. Robinson's Eighth Amendment claim against Dr. Dannewitz must fail as well, though for different reasons. Mr. Robinson alleges, and the record demonstrates, that he saw Dr. Dannewitz twice for pain in his foot. And twice, Dr. Dannewitz accepted Mr. Robinson's complaints and immediately provided treatment and ordered diagnostic testing. Dr. Dannewitz's actions clearly do not reflect deliberate indifference; quite the opposite. He took Mr. Robinson's complaints seriously and acted accordingly. These actions are not "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Jackson v. Buckman*, 756 F.3d 1060, 1066 (8th Cir. 2014).

Further, the heart of Mr. Robinson's claim, the misdiagnosis of his fractured foot, was not done by Dr. Dannewitz. Instead, he twice relied on the report of now-dismissed defendant Dr. Glaser, who apparently missed the presence of the fracture on the x-rays she reviewed. "Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990). Even if the Court were to accept Mr. Robinson's argument that the misdiagnosis was so negligent that it rose to the level of deliberate indifference, Dr. Dannewitz did not make that misdiagnosis—Dr. Glaser is the individual allegedly responsible for that. Additionally, even if Dr. Dannewitz's reliance on Dr. Glaser's report could ever be construed as negligent—a conclusion unsupported by the record or the law—this would still not constitute an Eighth Amendment violation. *Fourte v.*

6

*Faulkner Cty., Ark.*, 746 F.3d 384, 387 (8th Cir. 2014) (noting that negligence or even gross negligence does not substantiate an Eighth Amendment claim of deliberate indifference). In sum, nothing in the record supports a finding of deliberate indifference by Dr. Dannewitz. He too is entitled to summary judgment on those claims.

### 3.     Claims Against the Centurion Defendants

Mr. Robinson's Eighth Amendment claims against the Centurion defendants fail for the same reasons as discussed above. It is unclear whether Mr. Robinson even saw Nurse Luck in April 2014, as the Department of Corrections has no record of this. However, even if she or another Centurion provider was the individual who performed Mr. Robinson's initial evaluation, there is no evidence that she displayed deliberate indifference. Mr. Robinson argues that Nurse Luck ordered the incorrect area imaged, but the medical records from his initial evaluation do not support this. The record shows that Mr. Robinson complained of pain in his ankle after hearing a "pop" there. (ECF No. 256 at 4; *see also* ECF No. 343 at 11.) At the time of his initial evaluation, Mr. Robinson believed his ankle, not his foot, was broken. Ordering an x-ray of his ankle was consistent with complaints of ankle pain—something with which Mr. Robinson's own expert agrees. (ECF No. 344-2 at ¶ 17 ("If pain was localized to and limited to the ankle, then ankle x-rays alone would be the appropriate imaging evaluation.") In addition, the record shows that Nurse Luck provided ice, a CAM walker boot, and crutches, which Dr. Seybold, Mr. Robinson's proffered expert, concedes would be appropriate care. (Declaration of Tony Terrell Robinson, ECF No. 344, Ex. 1 at 2 (opining that a fracture like Mr. Robinson's would ordinarily be treated conservatively, including "nonweightbearing or protected weightbearing in a cast boot.").) Providing medical care consistent with a plaintiff's complaints cannot support a claim of deliberate indifference, even if later symptoms reveal that the initial diagnosis was incorrect. As discussed above, even if the Centurion defendants' actions could be construed as medical negligence, this would not support Mr. Robinson's Eighth Amendment claims. *E.g.*, *Fourte*, 746 F.3d at 387.

### C.     Medical Malpractice

All defendants argue that Mr. Robinson's state medical malpractice claims must

7

be dismissed against them because he has failed to comply with the mandatory requirements of Minnesota Statutes section 145.682. The Court agrees with the defendants.

In Minnesota, if a medical malpractice claim will require expert testimony to establish a prima facie case, the plaintiff must satisfy certain preliminary requirements. One-hundred eighty days after the commencement of a suit, the plaintiff must file an expert disclosure that includes:

> [T]he identity of each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

Minn. Stat. § 145.682, subd. 4. If the plaintiff does not comply with this requirement, dismissal with prejudice of each applicable cause of action is mandatory upon motion to the court. *Id.*, subd. 6; *see also Lindberg v. HealthPartners, Inc.*, 599 N.W. 2d 572, 578 (Minn. 1999).

Most medical malpractice cases require expert testimony, because they generally involve complex scientific or technological issues. *Mercer v. Andersen*, 715 N.W.2d 114, 122. A narrow exception exists when the alleged negligence of the healthcare provider is "within the general knowledge or experience of laypersons…. But only rarely does section 145.682 not apply." *Id.* In cases involving an alleged failure to diagnose, such as the case here, expert testimony is required to show the applicable standard of care for diagnosing the medical condition, as well as whether the defendant's alleged actions failed to meet that standard. *Bellecourt v. United States*, 784 F.Supp. 623, 638–39 (D. Minn. 1992).

Mr. Robinson has submitted an expert disclosure from Dr. Seybold, the physician who finally diagnosed Mr. Robinson with a fracture after his release from state custody. He has also submitted multiple amended versions of that expert disclosure. In essence, Dr. Seybold opines that Mr. Robinson did not receive appropriate treatment for his fractured foot because the fracture was not identified on the x-rays taken. However, none of the documents meet the requirements of section 145.682. A compliant expert affidavit has three elements: "(1) disclose specific details

concerning the expert's expected testimony, including the applicable standard of care; (2) identify the acts or omissions that the plaintiff alleges violated the standard of care; and (3) include an outline of the chain of causation between the violation of the standard of care and the plaintiff's damages." *Teffteller v. University of Minn.*, 645 N.W.2d 420, 428 (Minn. 2002) (citing *Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188, 190 (Minn. 1990)).

Dr. Seybold's affidavit does not meet these requirements. Critically, Dr. Seybold is not qualified to opine on the standard of care required of any of the remaining defendants. Dr. Seybold is a board-certified orthopedic surgeon; presumably, he would be qualified to opine on the standard of care for an orthopedic surgeon. But Dr. Saini is a radiologist,[1] Dr. Dannewitz is an emergency-medicine physician, and Nurse Luck is a nurse. A medical expert must have "sufficient scientific knowledge" and at least some of the same practical experience as the defendant his testimony concerns. *Koch v. Mork Clinic, P.A.*, 540 N.W. 2d 526, 529 (Minn. Ct. App. 1995); *c.f. Lundgren v. Eustermann*, 370 N.W. 2d 877, 880 (Minn. 1985) ("the standard of care to be applied is that standard of skill and learning ordinarily possessed and exercised under similar circumstances by physicians in good standing in the same or similar localities."). Dr. Seybold even acknowledges his lack of qualification to opine on the appropriate standard of care. (Robinson Decl., ECF No. 344, Ex. 2 at 2 ("I personally cannot provide specific information with regard to the standard of care that is expected for medical practitioners out of my own area of expertise.").)

This is a fatal flaw. A proffered expert must have training and practical or occupational experience "within the specific area about which he is to testify." *Anderson v. Florence*, 181 N.W. 2d 837, 878 (Minn. 1970); *see also Lundgren*, 370 N.W. 2d at 880. A physician acting as an expert witness must have an "understanding of what would

---

[1] Mr. Robinson argues that the requirements of section 145.682 do not apply to his claim against Dr. Saini because Dr. Saini is not a health care provider as defined by the statute. This assertion is without merit. The statute states: "For purposes of this section, "health care provider" means a physician, surgeon, dentist, or other health care professional or hospital…." Minn. Stat. § 145.682(1). Mr. Robinson argues that Dr. Saini is not a certified health care professional, but this is irrelevant. Dr. Saini is a physician, and falls squarely within the definition of "health care provider."

9

usually and customarily be done by a doctor in a similar situation to that confronted by the defendant physician." *Mattke v. Deschamps*, 374 F.3d 667, 671 (8th Cir. 2004). Undeterred by Dr. Seybold's own admission that he does not have sufficient knowledge of the requisite standard of care, Mr. Robinson asserts that Dr. Seybold and Dr. Dannewitz, though they have different training and experience, both recognized the appropriate care for a foot sprain can be clinical examination and x-ray imaging. But this argument does not save the affidavit with respect to Dr. Dannewitz—or Dr. Saini or Nurse Luck, for that matter. The Eighth Circuit has expressly rejected that sort of argument in *Mattke v. Deschamps*. Though the expert in that case had some knowledge of pathology through the scope of his duties as a physician, he could not opine on the appropriate standard of care of a pathologist. *Id.* at 671–72.

Even if Dr. Seybold were qualified to opine about the appropriate standard of care for the defendants in this action, his affidavit fails to identify the specific actions that breached that standard of care or to set out a specific chain of causation between the defendants' actions and Mr. Robinson's damages. With respect to Dr. Dannewitz, Dr. Seybold does not opine that he violated any standard of care. Instead, he wrote that he "would not expect Dr. Dannewitz to necessarily identify, diagnose, or treat more unusual orthopedic injuries," such as a navicular fracture. (Robinson Decl., ECF No. 344, Ex. 2 at 1.) Indeed, Dr. Seybold states that Dr. Dannewitz appropriately ordered x-rays, and that, in the face of continuing pain despite the apparently negative x-rays, an orthopedic evaluation would have been the appropriate next step. (*Id.* at 2.) Dr. Dannewitz did not have an opportunity to make such a referral since Mr. Robinson was released from Lino Lakes shortly after Dr. Dannewitz saw him last. And Dr. Seybold does not opine that Dr. Dannewitz was required to make a referral sooner than that.

With respect to Dr. Saini and Nurse Luck, Dr. Seybold makes a broad conclusion: "As a result of the fracture having been missed radiographically, the standard of care for treatment of this fracture was not followed. This fracture was not recognized on multiple x-ray series of the foot." This does not meet the specificity requirements of section 145.682, and it is not even clear that Dr. Seybold is even alleging any failure as to either Nurse Luck or Dr. Saini. Expert affidavits that only contain broad, generalized statements regarding the standard of care are insufficient. For example, in *Anderson v. Rengachary*, 608 N.W. 2d 843 (Minn. 2000), the Minnesota Supreme Court rejected an expert affidavit that wrote simply "esophageal trauma

10

should be avoided during surgery of this type." *Id.* at 848. The court found that this statement was too vague to meet the requirements of section 145.682, because it failed to describe what actions a physician should take to avoid esophageal trauma, or discuss how the defendant's acts or omissions violated the standard and caused the alleged injuries. *Id.* Dr. Seybold's affidavit is quite similar to the affidavit in *Anderson*. Because there is no explanation of what steps physicians should take to provide the standard of care, or specific information about how Dr. Saini's acts or omissions violated the standard of care and caused Mr. Robinson's injury, Dr. Seybold's affidavit is insufficient to meet the requirements of section 145.682.[2]

Mr. Robinson has failed to comply with the expert affidavit requirement of section 145.682. Upon motion, dismissal with prejudice is required. Accordingly, the Court recommends that summary judgment be granted in favor of the defendants on Mr. Robinson's state medical malpractice claims.

### D.   Negligent and Intentional Infliction of Emotional Distress

Mr. Robinson has abandoned his negligent infliction of emotional distress and intentional infliction of emotional distress claims against all defendants. (ECF No. 343 at 8, 43, 59.) Therefore, the Court recommends that summary judgment be granted in favor of the defendants on all of these claims.

### III.   RECOMMENDATION

---

[2] The Court notes that even if the expert affidavit submitted by Mr. Robinson could satisfy section 145.682, its contents fail to create a genuine issue of material fact sufficient to defeat summary judgment. Even though Dr. Seybold suggests that the standard of orthopedic care for Mr. Robinson's fracture "was not followed," he clearly attributes that failure to the misreading of the x-rays, actions only attributable to Dr. Saini and the now-dismissed Dr. Glaser. But Dr. Seybold's affidavit fails to create a genuine issue of material fact even with respect to Dr. Saini because he does not (and by his own admission, cannot) opine that missing the navicular fracture in similar circumstances, when the doctor was asked to examine the ankle on the x-ray, was a violation of the standard of care expected of a radiologist. (*See* Robinson Decl., ECF No. 344, Ex. 1 at 2.)

11

Accordingly, IT IS HEREBY RECOMMENDED:

1. The defendants' Motions for Summary Judgment (ECF Nos. 219, 242, 252) be GRANTED.
2. Mr. Robinson's Motions to Deny Summary Judgment as Premature (ECF Nos. 268, 273) be DENIED.
3. All remaining motions (ECF No. 283, Motion to Stay Expert Discovery; ECF No. 297, Motion to Appoint Expert; ECF No. 319, Motion to have Subpoenas Served; and ECF No. 341, Motion to Join Motion to Stay Expert Discovery) be DENIED as MOOT.

Dated:  July 22, 2020                    *s/ Katherine Menendez*
                                         Katherine Menendez
                                         United States Magistrate Judge

# NOTICE

Filing Objections: This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

Under Advisement Date: This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.